IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| THOMAS PARSLEY, | ) | CASE NO. 1:17-cv-02586 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Thomas Parsley ("Plaintiff" or "Parsley") seeks judicial review of the final
decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner")
denying his application for social security disability benefits. Doc. 1. This Court has jurisdiction
pursuant to 42 U.S.C. § 405(g). This case is before the undersigned Magistrate Judge pursuant to
the consent of the parties. Doc. 13. For the reasons explained herein, the Court finds that the
ALJ did not adequately explain her reasons for the weight assigned to the opinions of treating
physicians Dr. Jones and Dr. Fox and the opinions of the state agency reviewing psychologists.
Accordingly, the Court **REVERSES and REMANDS** the Commissioner's decision.

## I. Procedural History

On January 22, 2015, Parsley protectively filed an application for supplemental security
income ("SSI").[1] Tr. 12, 86, 87, 159-164. Parsley alleged a disability onset date of March 1,
2012. Tr. 12, 87, 159, 188. He alleged disability due to herniated discs, lower back and left
shoulder pain, post-traumatic stress disorder (PTSD), and depression. Tr. 17, 87, 114, 122, 192.

---

[1] The Social Security Administration explains that "protective filing date" is "The date you first contact us about
filing for benefits. It may be used to establish an earlier application date than when we receive your signed
application." http://www.socialsecurity.gov/agency/glossary/ (last visited 1/28/2019).

After initial denial by the state agency (Tr. 114-116) and denial upon reconsideration (Tr. 122-123), Parsley requested a hearing (Tr. 124-126). On September 14, 2016, a hearing was held before Administrative Law Judge Catherine Ma ("ALJ"). Tr. 36-85. On November 28, 2016, the ALJ issued an unfavorable decision, (Tr. 9-35), finding that Parsley had not been under a disability within the meaning of the Social Security Act since January 22, 2015, the date the application was filed (Tr. 12, 32). Parsley requested review of the ALJ's decision by the Appeals Council. Tr. 156-158. On October 26, 2017, the Appeals Council denied Parsley's request for review, making the ALJ's November 28, 2016, decision the final decision of the Commissioner. Tr. 1-6.

## II. Evidence

### A.      Personal, vocational and educational evidence

Parsley was born in 1976. Tr. 30, 45, 159. He lived in a house with roommates. Tr. 44. Parsley had a girlfriend who did not live with him. Tr. 45. Parsley completed two and one-half years of college. Tr. 46. He studied nursing at Cleveland State University but did not complete the program. Tr. 46. Parsley last worked delivering pizza for a short period of time. Tr. 49. That employment ended in March of 2012 after he injured his right shoulder and neck at work. Tr. 49-50. He slipped on the ice while delivering a pizza. Tr. 50. Parsley also worked at University Hospital performing three different positions - patient transport, clinical partner (nursing assistant), and registering patients (admitting clerk). Tr. 50-58. While working at University Hospital, Parsley also sustained work injuries. Tr. 51. He injured his back lifting a 450-pound patient who had fallen out of bed and, on a different occasion, while working at the registration desk, he was unable to stand back up after trying to get something out of a filing cabinet. Tr. 51.

**B. Medical evidence**

**1. Treatment history**

**a. Physical impairments**

In connection with alleged work-related injuries, on July 5, 2012, Parsley saw Dr. David M. Wendt, M.D., for follow up regarding a herniated cervical disc and right shoulder sprain. Tr. 242. Dr. Wendt noted that Parsley's attorney was attempting to schedule a hearing date for Parsley's worker's compensation claim. Tr. 242. A few days later, on July 12, 2012, Parsley saw his primary care physician David C. Jones, M.D., for a follow up regarding an assault that had occurred two days prior. Tr. 240. Parsley had been assaulted by his uncle. Tr. 240. Parsley had sought emergency room treatment. Tr. 240. Parsley relayed to Dr. Jones that most of his pain was in his left shoulder. Tr. 240. Dr. Jones' assessment was concussion, left shoulder sprain, and left knee contusion. Tr. 240. He advised Parsley to continue with Vicodin as needed and he referred Parsley to physical therapy. Tr. 240. At that time, Parsley had no insurance so it was not certain he could proceed with physical therapy. Tr. 240. On April 26, 2013, Parsley sought emergency room treatment for left shoulder pain after having helped a friend move a couch the prior week. Tr. 412. Parsley relayed having prior problems with his shoulder. Tr. 412. A review of Parsley's chart indicated he had been kicked out of pain management the prior year for having prescriptions from multiple providers. Tr. 412. The emergency room physician assessed left shoulder tendonitis with rotator cuff injury and recommended rest and use of a sling and ice. Tr. 413. A short course of Percocet was prescribed for pain. Tr. 413.

On May 27, 2014, upon Dr. Jones' referral, Parsley saw Dr. Kermit W. Fox, M.D., with the Physical Medicine & Rehabilitation Clinic ("PM&R Clinic") at MetroHealth Medical Center for a consultation regarding options for management of Parsley's low back pain. Tr. 512-515.

Parsley relayed a history of back pain starting in late 2003 when he injured himself at work. Tr. 512. He attempted physical therapy without improvement. Tr. 512. He had an L5-S1 laminectomy/discectomy in 2004 with improvement for about six months until his pain returned following incidental bending at work. Tr. 512. Parsley had numerous injections and attended physical therapy. Tr. 512. In 2008, Parsley had a cyst removed from the right L5 versus S1 nerve root without relief. Tr. 512. Parsley relayed that, since 2008, he had been sent from doctor to doctor, received occasional injections, and was prescribed a lot of narcotics. Tr. 512. In 2012, Parsley settled a workers' compensation claim. Tr. 512. Also, in the summer of 2012, he was assaulted by his uncle, injuring his left shoulder and causing an increase in his back pain. Tr. 512; *see also* Tr. 240. Parsley also reported having PTSD from the assault. Tr. 512. Parsley did not need to have surgery on his shoulder and reported to Dr. Fox that his shoulder was "doing rather well[.]" Tr. 512. His primary complaint during his visit with Dr. Fox was his back pain. Tr. 512. On physical examination, Dr. Fox observed no tenderness over the bilateral lumbosacral paraspinals but minimal paraspinal spasm. Tr. 514. Parsley's spine range of motion was moderately decreased with concordant pain at flexion end ranges. Tr. 514. The combination of extension and rotation resulted in no pain. Tr. 514. Parsley's hip range of motion was normal with no pain. Tr. 515. Parsley's sensation was decreased to light touch and temperature in the L5 and S1 right lower limb dermatomes. Tr. 515. Parsley's muscle tone was normal and his strength was normal except for decreased ankle dorsiflexion, great toe extension and plantarflexion on the right. Tr. 515. Dr. Fox diagnosed failed back syndrome, lumbar; lumbar radiculitis; and displacement of lumbar intervertebral disc without myelopathy. Tr. 515. Dr. Fox's treatment recommendations included medication, physical therapy, and daily home

exercises.  Tr. 515.  Dr. Fox also recommended a lumbar spine MRI and an electrodiagnostic study for right L5 versus S1 radiculopathy.  Tr. 515.

Parsley had a lumbar spine MRI performed on August 6, 2014.  Tr. 607-608.  The impression was right L4 nerve root compression secondary to a L4-5 lateral disc and postsurgical changes at L5-S1 with granulation tissue surrounding both left and right S1 nerve roots.  Tr. 607-608.

On September 29, 2014, Parsley presented to the emergency room with right hip pain that had gotten progressively worse over the prior week.  Tr. 498.  The pain occasionally radiated down the right leg into his upper calf.  Tr. 498.  Parsley relayed that his primary care physician was Dr. Jones and he was supposed to use a cane.  Tr. 498.  On examination, it was noted that Parsley appeared to be in moderate distress but his pain was out of proportion to light touch of skin.  Tr. 499.  Parsley exhibited mild, diffuse midline bony tenderness in his back.  Tr. 499.  In his right lower extremity, Parsley exhibited tenderness in the right hip; severe pain with axial loading, shooting into the upper calf; limited internal rotation but intact external rotation of the right hip; and 4/5 plantarflexion.  Tr. 499.  Parsley had an antalgic gait and preferred to use his left leg.  Tr. 499.  Parsley was not using a cane during the visit.  Tr. 500.  He was offered a walker but declined, indicating he preferred to use a cane.  Tr. 499.  Parsley reported taking Vicodin the day before with some mild relief.  Tr. 498.  The emergency room physician noted that Parsley's medical records reflected that he frequently missed medical appointments.  Tr. 499.  It was also noted that Parsley had been receiving monthly prescriptions for Methadone; his last Vicodin prescription was in December; and Parsley was not suspicious for narcotic seeking behavior.  Tr. 500.  Parsley was diagnosed with acute on chronic right hip pain and known L4-5

and L5-S1 disease.  Tr. 500.  He was discharged in stable condition and instructed to follow up with his primary care physician or the PM&R clinic.  Tr. 500.

On October 1, 2014, Parsley saw Dr. Jones.  Tr. 497.  Parsley relayed that he had tripped and fell over a dog leash.  Tr. 497.  He was stiff and in significant pain the following morning.  Tr. 497.  Parsley was having difficulty sitting, standing and moving, reporting that it was the worst pain ever.  Tr. 497.  He had taken his last two Vicodin pills.  Tr. 497.  It was noted that Parsley's emergency department evaluation was negative.  Tr. 497.  Parsley had been using a cane but noted that he regretted not taking the walker that had been offered to him.  Tr. 497.  Dr. Jones diagnosed chronic low back pain; IT band syndrome; trochanteric bursitis; and hamstring muscle strain.  Tr. 497.  Dr. Jones indicated that the Methadone dose would not be adjusted.  Tr. 497.  Dr. Jones provided Parsley with a limited course of Percocet and suggested that he try to switch to baclofen and use topical lidocaine.  Tr. 497.  Dr. Jones noted that Parsley had an upcoming PM&R appointment.  Tr. 497.  Dr. Jones advised Parsley that if he continued to "no show to appointments for adjuvant therapy," Dr. Jones would be required to stop prescribing controlled substances.  Tr. 497.

Parsley saw Dr. Fox on October 21, 2014, for follow up regarding his low back pain.  Tr. 482-486.  Parsley relayed increasing pain over the prior three weeks.  Tr. 482.  Parsley noted partial relief with Cymbalta and Naproxen.  Tr. 482.  He also took Methadone with Percocet for breakthrough relief; he used Voltaren gel with modest relief; he had switched from Robaxin to baclofen with minimal difference; and he used Lamictal for PTSD and nerve pain.  Tr. 482.  Dr. Fox noted the August 2014 MRI results, showing scarring around the right S1 nerve root and an L4-5 disc herniation affecting the right L4 nerve root, and an October 14, 2014, electrodiagnostic study, showing right L5 radiculopathy and some evidence of S1 compromise.  Tr. 482, 485.  Dr.

Fox diagnosed failed back syndrome, lumbar; lumbar radiculitis; and displacement of lumbar intervertebral disc without myelopathy. Tr. 485. Dr. Fox recommended a caudal steroid injection and physical therapy. Tr. 485-486. Dr. Fox encouraged Parsley to wean off opiates. Tr. 485.

Upon Dr. Fox's referral, on November 6, 2014, Parsley saw Dr. James K. Liu, M.D., in the Department of Neuroscience. Tr. 476-480. Parsley relayed that he had fallen three months earlier when playing with his dog and had been experiencing right leg pain and back pain. Tr. 477. Most of his pain was in his leg and it was worse with standing and walking and improved with rest. Tr. 477. Physical examination findings were generally normal with the exception of some weakness in Parsley's right knee with extension, flexion and dorsiflexion; a positive straight leg raise; and antalgic gait. Tr. 479. Considering the relative acute nature of Parsley's recent symptoms, Dr. Liu recommended that Parsley continue with the planned conservative therapy of physical therapy and injections. Tr. 480. If those treatments did not work, Dr. Liu noted that open decompression could be discussed. Tr. 480. Dr. Liu recommended that Parsley return for follow up in four to six weeks. Tr. 480.

Parsley had a caudal injection on November 19, 2014. Tr. 462, 463. During a follow-up visit with Dr. Fox on December 16, 2014, Parsley reported minimal improvement in his low back pain since his injection. Tr. 462-466. Following the injection, he had mild pain relief for about three days. Tr. 462, 463. Parsley had attended four physical therapy sessions. Tr. 462. He was making progress with core strengthening and his mobility was improving but there had been no change in his pain levels. Tr. 462. Dr. Fox continued to diagnose Parsley with failed back syndrome, lumbar; lumbar radiculitis; and displacement of lumbar intervertebral disc without myelopathy. Tr. 466. Dr. Fox continued to recommend a conservative course of treatment. Tr.

466.  He recommended that Parsley undergo a transforaminal epidural steroid injection at the right L5 and S1 area; continue his current medications of Cymbalta, Effexor, Diclofenac Gel, Baclofen, Lamictal, and Methadone; wean off opiates; continue physical therapy; and continue with a home exercise program.  Tr. 466.

In a May 27, 2015, "To whom it may concern" letter (Tr. 997-998), Dr. Jones indicated he was closing his outpatient practice and had referred Parsley to Dr. Michael Harrington with MetroHealth's Palliative Care department for prescription of his narcotic medications (Tr. 998). Dr. Jones noted that Parsley would need to establish a new primary care physician.  Tr. 998.   In his May 27, 2015, letter, Dr. Jones explained Parsley's treatment history while under his care, noting prior diagnostic studies of his lumbar spine and shoulder and treatment for chronic low back pain (with objective evidence of disc herniation and scarring and nerve root compressions), and shoulder issues, which was complicated by significant depression, PTSD, anxiety, elements of agoraphobia, and chronic insomnia.  Tr. 997.  Dr. Jones indicated that Parsley's conditions had been treated with high potency narcotics, physical therapy, psychiatry/psychology, and PM&R.  Tr. 997.  Dr. Jones noted that Parsley had qualified for and was enrolled in home-based physical therapy, psychology and psychiatry. Tr. 997.  Parsley had been unable to wean off of narcotics, which Dr. Jones noted was the initial goal when transitioning Parsley to Methadone. Tr. 998.

Parsley saw Dr. Harrington on June 1, 2015, for a palliative care consultation regarding assumption of Parsley's Methadone treatment.  Tr. 728-730, Tr. 748-751.  Parsley's pain was mostly in his right leg, which he described as throbbing, aching, and constant.  Tr. 728. Parsley's pain was worse when in any position for a prolonged period.  Tr. 728.  Treatment notes reflect that Parsley was performing more exercise but the same notes indicate that Parsley's

weight was up, he was making poor food choices and was not active. Tr. 728. He indicated that the pool, hot tub and medication helped. Tr. 728. Parsley was staying functional on his current regimen. Tr. 728. He had not had any emergency department visits. Tr. 728. Cymbalta was helping Parsley with his PTSD and mood. Tr. 728. Parsley's neurological examination showed that his reflexes, sensation, motor strength, fine motor coordination, and gait were normal. Tr. 730. Dr. Harrington diagnosed radicular pain of the right lower extremity, chronic pain, and failed back syndrome. Tr. 730. Dr. Harrington noted, "Functionally this is the best he has done and pain management wise on this regimen so no reason to stop or alter it as has a sig disease[.] Goal of this therapy is to allow him to be more active to lose weight[.]" Tr. 730. Dr. Harrington also indicated that Parsley had depression and PTSD, which impaired his ability to try to move forward and cope with his pain and debility. Tr. 730.

The next day, on June 2, 2015, Parsley saw Dr. Fox. Tr. 723-727, 757-764. Parsley relayed that he had ongoing pain. Tr. 723, 724. He had not received the most recently recommended epidural injection in December, citing transportation issues and some anxiety as the reason for the delay regarding the injection. Tr. 723, 724. Dr. Fox encouraged Parsley to follow up with neurosurgery since he had not done so. Tr. 723. Parsley attended physical therapy for his back and shoulder. Tr. 723, 724. He was also doing some pool therapy on his own. Tr. 723. Parsley reported that his medications were reasonably helpful and he was continuing to use a TENS unit. Tr. 723. Dr. Fox observed tenderness over the bilateral lumbosacral paraspinals, greater on the right than the left; minimal paraspinal tenderness; range of motion in the spine was moderately decreased; normal range of motion in the hips; sensation in the S1 and S2 of the right lower limb dermatomes was decreased to light touch; allodynia over the dorsum of the foot and discoloration of the foot; muscle tone was normal and symmetric;

strength was normal except for decreased ankle dorsiflexion, great toe extension, and plantarflexion on the right primarily; reflexes were normal and symmetric. Tr. 726. Parsley planned to continue his pain management treatment with Dr. Harrington and to follow up with Dr. Fox as needed. Tr. 723.

On June 15, 2015, Parsley saw Dr. Liu for follow up. Tr. 776-777. Parsley reported increased mobility due to therapy since his last office visit which was in November 2014 but worsening pain. Tr. 776. Parsley relayed that his pain remained in his lower back into his right leg. Tr. 776. Parsley was ambulating with a cane. Tr. 776. On examination, Parsley exhibited a positive straight leg raise on the right. Tr. 776. He had an antalgic gait. Tr. 776. Parsley's strength in his upper extremities was normal and he had normal reflexes. Tr. 776-777. He had some decreased strength on the right side in his lower extremities. Tr. 776. Dr. Liu assessed lumbar spondylosis. Tr. 777. Dr. Liu noted that it did not appear that Parsley's right L4-L5 far lateral disc herniation was the source of his pain and noted mild foraminal narrowing in the right L5-S1 foramen. Tr. 777. Dr. Liu noted that he discussed with Parsley that "given his major concern is back pain, surgical intervention has a low likelihood of effectiveness for his symptoms." Tr. 777. Dr. Liu discussed non-surgical interventions and advised Parsley to follow up as needed. Tr. 777.

Parsley saw Dr. Harrington on August 14, 2015, for follow up. Tr. 782-784. Parsley had lost ten pounds since his June 1, 2015, visit. Tr. 783. On physical examination, Parsley's reflexes in his upper and lower extremities were normal with "downgoing plantar responses." Tr. 783. Sensory examination showed normal sensation in all dermatomal regions bilateral upper and lower extremities. Tr. 783. Parsley's motor strength was normal in all myotomal regions bilateral upper and lower extremities. Tr. 783. Parsley's fine motor coordination and

gait were normal. Tr. 783. Dr. Harrington noted the following diagnoses – radicular pain of the right lower extremity, chronic pain, failed back syndrome, PTSD, depression, and obesity. Tr. 783-784. Dr. Harrington advised Parsley that he could increase his Percocet to help him through the night. Tr. 784. Parsley would see Dr. Fox for injections as needed. Tr. 784.

Parsley saw Dr. Jeffrey Rosenberg, M.D., on September 22, 2015, for transfer of care regarding his low back pain and failed back syndrome. Tr. 790-794. Parsley relayed his physical problems and also relayed that he had significant anxiety and PTSD. Tr. 790. Parsley reported some elevated blood pressure readings, which were higher when he was having pain. Tr. 790. Parsley indicated he was not able to watch his diet since he was on food stamps. Tr. 790. Parsley relayed that he was in the process of applying for disability. Tr. 793. Dr. Rosenberg's examination of Parsley's back revealed central and right lumbar tenderness with some right lumbar paraspinal tightness. Tr. 793. With respect to Parsley's failed back/chronic low back pain, Dr. Rosenberg recommended that Parsley continue with his present pain management and follow up with Dr. Harrington in three months. Tr. 794.

Parsley saw Dr. Rosenberg on February 23, 2016, for follow up regarding his hypertension and he was requesting a disability examination. Tr. 832-835. Parsley's weight was down. Tr. 832, 833. Parsley was having improved control of his hypertension. Tr. 832. Dr. Rosenberg referred Parsley to PMR for a disability examination. Tr. 834.

On April 22, 2016, Parsley saw Dr. Harrington. Tr. 857-860. Dr. Harrington observed that there was no reason to stop or alter Parsley's current regimen because Parsley was doing a great job of taking his health care in his own hands, losing weight, and increasing his strength and activity. Tr. 859. Also, Parsley had been able to cut down on his Methadone. Tr. 859.

Parsley saw Dr. Fox for follow up on May 17, 2016, indicating he needed a disability assessment. Tr. 907-914. Dr. Fox observed that Parsley was returning to see him after one year and noted that Parsley had decreased his pain medications because he had intentionally lost 50 pounds and there had been some improvement in Parsley's ability to walk distances but, overall, Parsley reported minimal subjective changes in his pain levels and he was applying for disability. Tr. 913. At the conclusion of the May 17, 2016, visit, Dr. Fox noted that he would see Parsley again to complete the disability evaluation because they were limited by time since Parsley was only scheduled for a follow-up visit. Tr. 913-914.

On June 14, 2016, Parsley saw Dr. Fox for completion of the disability evaluation. 927-935, 1003-1009. Dr. Fox noted that Parsley had lost 55 pounds with diet and walking for exercise. Tr. 928. Parsley indicated that his endurance and mobility had improved but he still had constant pain. Tr. 928. Parsley was walking around his block three times, which took him 45 minutes. Tr. 928. He was able to repeat that walk the next day. Tr. 928. After walking, Parsley had similar but not increased pain. Tr. 928. Parsley was also swimming and walking in the water three times each week. Tr. 928. Dr. Fox performed a physical examination. Tr. 932-933. The neuro-upper examination showed that Parsley's sensation was grossly intact to light touch and temperature; his strength was normal and symmetric; his muscle tone was normal and symmetric throughout without clonus; and his reflexes were normal and symmetric. Tr. 932. The musculoskeletal-upper examination showed symmetry without atrophy with range of motion moderately decreased with bilateral lateral bending and bilateral lateral rotation with concordant pain at end ranges. Tr. 932. The neuro-lower examination showed that slump in the lower limb produced concordant right lower limb pain; sensation was decreased to light touch and temperature in the L4-S1 right lower limb dermatomes; there was allodynia over the dorsum of

the foot and discoloration of the foot; muscle tone was normal and symmetric without clonus; there was decreased strength through the right lower limb; and patellar and achilles reflexes were normal and symmetric without toes down-going on the bilateral sides. Tr. 933. The musculoskeletal-lower examination showed symmetry without atrophy and a vertical scar was noted; Parsley's spine range of motion was moderately decreased with concordant pain at flexion end ranges - the combination of extension and rotation resulted in no pain; and Parsley's hip range of motion was normal with no pain at end range internal rotation and external rotation. Tr. 933.

### b. Mental health impairments

On Dr. Jones' referral, beginning in September 2013, Parsley started receiving counseling services through MetroHealth Medical Center for depression. Tr. 328-334. Parsley's treatment provider was Sheerli Y. Ratner, Ph.D. Tr. 334. During the health assessment in September 2013, Parsley explained that he had recently been through a divorce. Tr. 330. He relayed that he had been assaulted by an uncle who had abused him most of his life. Tr. 330, 333. He was grieving the loss of family members and struggled with injuries that had affected his functional abilities. Tr. 330, 333. Dr. Ratner observed that Parsley was sleepy/tired; anxious; he was oriented to time, person and place; his speech was a normal rate and flow; his thought process was organized; his association was tight; his judgment and insight were fair; he had good recent and remote recall; his attention span and concentration were sustained; his mood was depressed; and his affect was tearful. Tr. 333. Dr. Ratner diagnosed depression. Tr. 333.

Parsley continued to see Dr. Ratner through at least March 2015. Tr. 271-272, 295-296, 313-314, 330-331, 449-452, 460-461, 486-487, 502-503, 510, 518, 521-522, 532-533, 647-717. Throughout the course of his treatment with Dr. Ratner, Parsley was depressed and anxious and,

at times, he was struggling with leaving his home. *See e.g.,* Tr. 313-314 (12/3/2013); Tr. 271-272 (5/1/2014); Tr. 502 (9/10/2014); Tr. 647-648 (3/23/2015). One time, while he was waiting for a counseling session in October 2014, Parsley was involved in a verbal altercation with a woman. Tr. 681. He told a woman to stop being rude and she became verbally abusive towards him. Tr. 681.

During counseling sessions, Parsley was generally cooperative and his memory, concentration, and attention were sustained and/or within normal limits. *See e.g.,* Tr. 314, 272, 450, 502, 522, 648. Parsley had some suicidal thoughts and attempts during the course of his treatment. During a February 2, 2015, session with Dr. Ratner, Parsley reported some suicidal thoughts but Dr. Ratner indicated there was no imminent risk at that time. Tr. 461. During that same session, Parsley relayed he had gone on a date with a really nice nurse. Tr. 460. It was someone he had known for a number of years. Tr. 460. During a February 11, 2015, visit with Dr. Jones, Parsley reported a prior suicide attempt in December. Tr. 446. Parsley indicated he had taken three times the normal amount of his Methadone. Tr. 446. Parsley relayed that he was suffering from severe depression but no longer had suicidal or homicidal ideations. Tr. 446. Parsley indicated he had spoken with his psychologist about the incident. Tr. 446. Although Parsley was no longer actively suicidal, Dr. Jones requested an additional psychiatric referral in addition to his established psychologist and Dr. Jones increased Parsley's Risperdal. Tr. 446.

> 2. **Opinion evidence**
>
> > a. **Physical impairments**
>
> ***Treating physicians***
>
> *Dr. Jones – June 10, 2015*

On June 10, 2015, Dr. Jones completed a Medical Source Statement. Tr. 999-1001. Dr. Jones indicated he had been seeing Parsley every three months since May 6, 2013. Tr. 999. Dr. Jones listed Parsley's diagnoses as chronic pain, failed back syndrome, lumbar spondylosis with facet arthropathy with nerve root compression, and depression and anxiety with agoraphobia. Tr. 999. Dr. Jones noted that Parsley's symptoms were severe recurrent back pain with radicular pain complicated by significant depression/anxiety with agoraphobia and PTSD. Tr. 999. Dr. Jones listed Parsley's medications, noting that Methadone, Percocet and Baclofen caused sedation, dizziness, and fatigue. Tr. 999.

In the Medical Source Statement, Dr. Jones opined that Parsley could occasionally lift and/or carry 10 pounds; occasionally handle and grasp; and frequently finger. Tr. 1000. Dr. Jones opined that, without interruption, Parsley could stand for one hour, walk for one hour, and sit for two hours. Tr. 1000. Dr. Jones opined that, through an 8-hour workday, Parsley could stand for a total of 2 hours, walk for a total for 4 hours, and sit for a total of 4 hours. Tr. 1000. Dr. Jones opined that Parsley would require frequent unscheduled breaks during the workday of 10-15 minutes; would be expected to be off task 20-25% of time; and would be absent at least 30% of the time due to his pain and anxiety. Tr. 1000.

### Dr. Fox – June 14, 2016

As part of his June 14, 2016, evaluation, Dr. Fox provided the following estimation of Parsley's functional abilities: Parsley was capable of lifting 5 pounds on a frequent basis and 10 pounds occasionally; could stand/walk 1 hour in an 8-hour day; could sit about 4 hours in an 8-hour day; could sit and stand for 30 minutes before changing positions and would have to get up and walk around for about 15 minutes; would have to shift at will; would have limited ability to squat, bend, twist, reach, climb and take stairs; would probably miss more than 6 days per month

due to medical conditions; would need as many as 3 breaks per day of 15-minute duration; and he would have no environmental limitations or limitations in his ability to handle. Tr. 934. In order for Parsley to be employable, Dr. Fox indicated that Parsley would need a position that could accommodate the stated restrictions. Tr. 934.

### *State agency reviewing physicians*

On May 5, 2015, state agency reviewing physician Rannie Amiri, M.D., completed a Physical RFC Assessment. Tr. 93-95. Dr. Amiri found that Parsley could occasionally lift and/or carry 20 pounds and frequently lift and/or carry 10 pounds; stand and/or walk for 4 hours in an 8-hour workday; sit about 6 hours in an 8-hour workday; ability to push and/or pull was limited in the right lower extremities to frequent; could never crawl or climb ladders/ropes/scaffolds; could occasionally climb ramps/stairs and stoop; could frequently balance, kneel or crouch; limited to occasional overhead reaching on the left; and should avoid all exposure to hazards (commercial driving, operating dangerous machinery, and unprotected heights). Tr. 93-95.

Upon reconsideration, on June 23, 2015, state agency reviewing physician Venkatachala Sreenivas, M.D., affirmed Dr. Amiri's functional limitations. Tr. 107-109.

### b. **Mental health impairments**

### *Treating mental health counselor*

On August 22, 2016, Monica Szleszynski, a licensed social worker who provided weekly mental health counseling services to Parsley starting on April 19, 2016,[2] completed a Mental RFC Assessment. Tr. 992-995. Ms. Szleszynski indicated that Parsley's diagnoses were PTSD and major depressive disorder. Tr. 993. She reported that Parsley was actively engaged in

---

[2] Ms. Szleszynski indicated that Parsley had been seeing a different counselor before he started sessions with her. Tr. 993.

treatment; working on processing past trauma; learning coping skills to manage his anxiety and depression and to improve his confidence and social interactions. Tr. 993. Ms. Szleszynski indicated that Parsley's symptoms were severe enough to cause him to be off task greater than 25% of the time. Tr. 993. She opined that Parsley would struggle significantly in completing an 8-hour workday, 5 days a week because his symptoms resulted "in sleep disturbances, concentration difficulty with confrontation, managing stress, excessive worry, low mood and or motivation that can last several days." Tr. 993. Ms. Szleszynski estimated that Parsley would be absent from work about 50% of the time because his "anxiety would affect his concentration, ability to focus on work/complete tasks in timely manner[]" and he demonstrated "excessive worry over being judged/scrutinized by others in his social or performance situations[]" which could cause him to avoid going to work. Tr. 994. Ms. Szleszynski rated Parsley's functional abilities in various work-related areas as moderate, marked or extreme. Tr. 994.

### *State agency reviewing psychologists*

On May 6, 2015, state agency reviewing psychologist Karla Voyten, Ph.D., completed a Psychiatric Review Technique ("PRT") (Tr. 92-93) and Mental RFC Assessment (96-98). In the PRT, Dr. Voyten found moderate restrictions in activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and no repeated episodes of decompensation, each of an extended duration. Tr. 92. In the Mental RFC Assessment, Dr. Voyten opined that Parsley was capable of understanding and recalling simple instructions; sustaining an ordinary routine with occasional prompting; interacting briefly and occasionally in situations that do not require more than superficial contact, resolving conflicts or persuading others to follow demands; and working in an environment where duties are fairly static. Tr. 96-98.

Upon reconsideration, on June 24, 2015, state agency reviewing psychologist Juliette Savitscus, Ph.D., completed a PRT (Tr. 105-106) and Mental RFC Assessment (Tr. 109-111). Dr. Savitscus reached similar conclusions as Dr. Voyten, except, with respect to Parsley's understanding and memory limitations, Dr. Savitscus indicated Parsley was capable of understanding and recalling simple instructions *1-3 steps*. Tr. 109-111. Dr. Voyten had concluded that Parsley was capable of understanding and recalling simple instructions, with no reference to 1-3 steps. Tr. 96.

**C.     Testimonial evidence**

**1.      Plaintiff's testimony**

Parsley was represented and testified at the hearing. Tr. 38, 43-55, 56, 58-76. When asked about gaps in his employment history, Parsley explained that he had a prior worker's compensation case that took a long time to finalize. Tr. 58. When asked why Parsley felt he could no longer work, Parsley indicated he was in a lot of physical pain on a daily basis and was agoraphobic from his PTSD. Tr. 59. He explained that he hardly leaves his home and, when he does leave, it is to go to his mother's house, his girlfriend's house, or the grocery store late at night. Tr. 59. Parsley felt that his conditions were so bad that he could concentrate on doing even simple chores only about 50% of the time. Tr. 74.

Parsley reported receiving mental health treatment starting in 2013 after being assaulted. Tr. 60. Parsley's PTSD and depression caused anxiety, shakiness, sweating, hopelessness, lethargy, and bouts of crying. Tr. 74. He initially received counseling services through MetroHealth and then started receiving counseling at his home through ViaQuest. Tr. 60. He was missing appointments because he would have panic attacks about attending appointments at an office. Tr. 60. In addition to counseling, Parsley was taking medication for treatment of his

mental health conditions.  Tr. 60-61.  Parsley felt that the medication and counseling was helping but, he felt that his mental health conditions were affecting his relationships with other people.  Tr. 61.  He did maintain a relationship with his mother and spoke on the phone with his father and sister who lived in Kentucky.  Tr. 61.  He and his girlfriend had been in a relationship for about a year and saw each other about three to four times each week.  Tr. 61-62.  They had known each other for 18 years.  Tr. 62.  His girlfriend had three children but Parsley did not have responsibility for caring for them.  Tr. 62.  Parsley had not seen friends for a few years.  Tr. 62.  He occasionally connected with others on Facebook.  Tr. 62.  He was not involved in any clubs or groups and did not really have any hobbies.  Tr. 63.

With respect to physical problems affecting his ability to work, Parsley noted weakness in his leg and chronic pain in his lower back, right hip and right leg.  Tr. 63.  Parsley first injured his back in 2003.  Tr. 63-64.  Thereafter, he had a laminectomy/discectomy in April 2004, numerous injections, and physical therapy.  Tr. 64.  Parsley had a second surgery in 2008 for arthritic cyst excision and more injections and more physical therapy.  Tr. 64.  He relayed that he had last had treatment on his back earlier in 2016 when he had physical therapy.  Tr. 65.  Parsley was continuing to take medication for his back.  Tr. 65.  He was taking Methadone twice a day for pain and Percocet four times a day for breakthrough pain.  Tr. 65-66, 71-72.  He had been taking Methadone three times a day but cut back in order to have a clearer head.  Tr. 66.  His pain level remained the same.  Tr. 66.  Parsley felt that Methadone was more effective than many of the pain medications that he had been prescribed.  Tr. 66.  Parsley started having problems with his right leg in the middle of 2005.  Tr. 66-67.  He did not have any procedures scheduled to treat his back, right hip or right leg.  Tr. 66.  He felt he had plateaued with his treatment.  Tr. 66.  Parsley had been using a cane for about three years, which Dr. Jones

recommended he use.  Tr. 74-75.  Parsley was supposed to use his cane as often as possible.  Tr. 75.  He did not use it all the time when at home.  Tr. 75.

Because of the problems with his back and leg, Parsley struggled with everything on a daily basis.  Tr. 67.  He relayed having problems sleeping, standing, walking, sitting, carrying and lifting.  Tr. 67.  Parsley felt he could stand about an hour and sit for maybe 2 hours.  Tr. 67.  He relayed having a hard time carrying and lifting 10 pounds.  Tr. 68.  Parsley would usually ask for assistance with putting grocery bags in the car when at the store.  Tr. 68.  He did have to carry the groceries in from his car to his house.  Tr. 68.  Parsley performed some light cooking.  Tr. 68.  He washed some dishes but limited it to about 10-15 minutes.  Tr. 68.  With respect to laundry, he waited for his girlfriend's children to come over to help him carry the laundry into the basement.  Tr. 69.  He had a hard time with other household chores such as vacuuming and sweeping.  Tr. 69.  He relayed that his roommate did not perform many household chores either and his house was not in the best order.  Tr. 69.  A neighbor mowed the lawn for him.  Tr. 69.  Parsley had two dogs that he took care of with help from his girlfriend and her children.  Tr. 45.  Parsley walked his dogs but indicated he could not do so every day.  Tr. 45.  When he walked his dogs, he walked them separately around the block once.  Tr. 48.  After walking his dogs, he paid for it the next day or two by being in bad pain.  Tr. 73.  Other than walking the dogs, during the day Parsley did not do a lot.  Tr. 70.  He usually watched television and did some stuff on the computer.  Tr. 70.  He would nap at least twice each day.  Tr. 70.  Parsley estimated lying down or sleeping about 15-16 hours a day and did not think he could go 8 hours without lying down.  Tr. 71.

**2.** **Vocational Expert**

Vocational Expert ("VE") Mary Harris testified at the hearing. Tr. 56-58, 76-83. The VE described Parsley's past relevant work to include: admitting clerk, a semi-skilled, sedentary position; nursing assistant, a semi-skilled, very heavy position (as performed); and patient transporter, an unskilled, very heavy position (as performed). Tr. 78. The ALJ asked the VE to assume an individual of Parsley's age, education and work experience who could lift and carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk for 4 hours out of an 8-hour workday; sit for 6 hours out of an 8-hour workday; have frequent right operation of foot controls; occasionally climb ramps and stairs; never climb ladders, ropes and scaffolds; frequently balance, kneel and crouch; occasionally stoop; never crawl; occasionally have left overhead reaching; never have exposure to hazards; limited to perform simple, routine tasks; have occasional interactions with supervisors, coworkers and the public; and was limited to routine workplace changes. Tr. 79-80. The VE indicated that none of Parsley's past relevant work would be available to the described individual. Tr. 80. However, other jobs would be available, including (1) officer helper; (2) hand packager; and (3) small product assembly. Tr. 80-81. The VE provided national job incidence data for the identified jobs. Tr. 80-81.

The ALJ next asked the VE to assume the first hypothetical but to reduce the individual to a full range of sedentary work. Tr. 81. The VE indicated that Parsley's past relevant work would not be available but there would be other jobs available, including (1) electronic assembly; (2) document preparer; and (3) final assembly. Tr. 81-82. The VE provided national job incidence data for the identified jobs. Tr. 81-82.

Parsley's attorney asked the VE to return to the first hypothetical but to add the following additional limitations – the individual would be limited to one-to-three step instructions; would need occasional prompting to sustain a routine; and could only have brief, occasional, superficial

contact with others.  Tr. 82.  The VE indicated that, with those additional limitations, there would be no work available to the described individual.  Tr. 82.  In response to further inquiry, the VE stated that there would be no work available to an individual described in either the first or second hypothetical who would be off task 20% of the time.  Tr. 83.  The VE also stated that an acceptable rate of absenteeism would be between one and two days per month, which would include having to leave early or arrive late, and there would be no work available to an individual who would be limited to a 6-hour workday.  Tr. 83.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[3] . . . .

42 U.S.C. § 423(d)(2)(A).

 In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.      If claimant is doing substantial gainful activity, he is not disabled.

---

[3] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  42 U.S.C. § 423(d)(2)(A).

2.      If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.      If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,[4] claimant is presumed disabled without further inquiry.

4.      If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform work available in the national economy. *Id.*

### IV. The ALJ's Decision

In her November 28, 2016, decision, the ALJ made the following findings:[5]

1.      Parsley has not engaged in substantial gainful activity since January 22, 2015, the application date. Tr. 14.

2.      Parsley has the following severe impairments: spine disorder, affective disorder, and anxiety disorder. Tr. 14. Parsley's sleep disorder is a non-severe impairment. Tr. 14.

---

[4] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience. 20 C.F.R. § 416.925.

[5] The ALJ's findings are summarized.

3.     Parsley does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. Tr. 14-16.

4.     Parsley has the RFC to perform light work as defined in 20 C.F.R. 416.967(b), except Parsley can lift and carry occasionally 20 pounds and frequently 10 pounds. He can stand and/or walk 4 hours out of an 8-hour workday and sit 6 hours in an 8-hour workday. He can have frequent right operation of foot controls. He can occasionally climb ramps and stairs, and never climb ladders, ropes, or scaffolds. He can frequently balance, kneel, and crouch, and occasionally stoop. He can never crawl. He can occasionally have left overhead reaching. He can never have exposure to hazards. He is limited to perform simple, routine tasks. He can have occasional interaction with supervisors, coworkers and the public. He is limited to routine workplace changes. Tr. 16-30.

5.     Parsley is unable to perform any past relevant work. Tr. 30.

6.     Parsley was born in 1976 and was 38 years old, which is defined as a younger individual age 18-49, on the date the application was filed. Tr. 30.

7.     Parsley has at least a high school education and is able to communicate in English. Tr. 31.

8.     Transferability of job skills is not material to the determination of disability. Tr. 31.

9.     Considering Parsley's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Parsley can perform, including office helper, hand packager, and small products assembly. Tr. 31-32.

Based on the foregoing, the ALJ determined Parsley had not been under a disability, as defined in the Social Security Act, since January 22, 2015, the date the application was filed. Tr. 32.

## V. Plaintiff's Arguments

Parsley argues that the ALJ's decision is not supported by substantial evidence because the ALJ did not adequately evaluate the medical opinion evidence when assessing his RFC. Doc. 15, pp. 12-17. With respect to physical impairments, Parsley claims that the ALJ did not

properly evaluate the opinions rendered by Dr. Jones and Dr. Fox – his treating physicians. Doc. 15, pp. 13-16. With respect to his mental health impairments, Parsley asserts the ALJ also erred, arguing that the ALJ assigned great weight to the state agency reviewing psychologists' opinions but omitted certain limitations contained in those opinions without offering an explanation as to why they were omitted. Doc. 15, pp. 16-17.

## VI. Law & Analysis

### A.      Standard of review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

**B.     Reversal and remand is warranted**

Parsley contends that reversal and remand is warranted because the ALJ did not adequately evaluate the medical opinion evidence when assessing his RFC. With respect to his physical impairments, Parsley argues that the ALJ erred in weighing the opinions of two of his treating physicians – Dr. Jones and Dr. Fox. Both Dr. Jones and Dr. Fox opined that Parsley was unable to perform even sedentary work. With respect to his mental health impairments, Parsley argues that reversal and remand is warranted because the ALJ assigned great weight to the state agency reviewing psychologists' opinions but omitted certain limitations contained in those opinions without offering an explanation as to why they were omitted.

Under the treating physician rule, "[t]reating source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c)(2)); *see also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for the weight he assigns to the opinion. *Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544; *Cole v. Comm'r of Soc. Sec.*, 661 F.3d 931, 937 (6th Cir. 2011). In deciding the weight to be given, the ALJ must consider factors such as (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors that tend to

support or contradict the opinion.  *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir.

2007); 20 C.F.R. § 404.1527(c).

An ALJ is not obliged to provide "an exhaustive factor-by-factor analysis" of the factors

considered when weighing medical opinions.  *See Francis v. Comm'r of Soc. Sec.*, 414 Fed.

Appx. 802, 804 (6th Cir. 2011).  However, the "good reasons must be supported by the evidence

in the case record, and must be sufficiently specific to make clear to any subsequent reviewers

the weight the adjudicator gave to the treating source's medical opinion and the reasons for that

weight."  *Cole*, 661 F.3d at 937 (quoting Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, at *12

(Soc. Sec. Admin. July 2, 1996)) (internal quotations omitted).  "This requirement is not simply a

formality; it is to safeguard the claimant's procedural rights [and] [i]t is intended 'to let claimants

understand the disposition of their cases, particularly in situations where a claimant knows that

his physician has deemed him disabled and therefore might be especially bewildered when told

by an administrative bureaucracy that he is not.'"  *Id.*  at 937-938 (citing *Wilson*, 378 F.3d at

544).  Moreover, "the requirement safeguards a reviewing court's time, as it 'permits

meaningful' and efficient 'review of the ALJ's application of the treating physician rule.'"  *Id.* at

938 (citing *Wilson*, 378 F.3d at 544-545).

Having reviewed the ALJ's decision and record before the Court, the Court finds that the

ALJ's weighing and consideration of the treating source opinion evidence falls short of

satisfying the requirements of the treating physician rule and further explanation of the ALJ's

consideration of the state agency reviewing psychologists' opinions is necessary.

### Dr. Jones

The ALJ provided reasons for assigning only little weight to Dr. Jones' June 10, 2015,

opinion.  However, without a more thorough analysis, the Court is unable to conduct a

meaningful review to assess whether the ALJ's reasons are "good reasons" supported by substantial evidence.

First, the ALJ stated that Dr. Jones' opinion was inconsistent with his "own treatment records, which indicated generally normal recent physical examinations and stable chronic pain on medication." Tr. 28.  In reaching this conclusion, the ALJ relied on Exhibits 3F/91-92, 68-69, 38-39, 9-10; 9F/2-3; and 11F/2-3.  However, the cited records do not provide clear support for the ALJ's first reason for discounting Dr. Jones' opinion.  For example, Exhibit 3F/91-92 is a treatment record from March 11, 2014.  Tr. 528-529.  While the treatment note indicates that Parsley "seem[ed] stable currently with regiment[,]" it does not reflect detailed physical examination findings and it is dated more than one year prior to Dr. Jones' opinion, which would not necessarily make it "recent."  Tr.  529.  The next citation, 3F/68-69, is another treatment note from 2014.  Tr. 505-506.  There is a reference to continuing Parsley's Methadone at the current dose but the treatment note does not reflect range of motion, strength, reflex or other detailed physical examination findings.  Tr. 505-506.  Exhibit 3F/38-39 is also a 2014 treatment note with no detailed physical examination findings.  Tr. 475-476.  Exhibit 3F/9-10 is from February 11, 2015.  Tr. 446-447.  While there is a note indicating "[c]urrent regiment stable" with respect to Parsley's chronic pain, the same treatment note reflects that Parsley had attempted suicide in December by taking three times his Methadone dose.  Tr. 446.  Additionally, there are no detailed physical examination findings.  Tr. 446.  The final two cited records (Exhibit 9F/2-3 and Exhibit 11F/2-3) are the same record, which is Dr. Jones' May 27, 2015, letter, indicating he was closing his outpatient practice effective July 1, 2015, and summarizing his prior treatment of Parsley.  Tr. 997-998, 1017-1018.  Dr. Jones' May 27, 2015, states that Parsley had been "relatively stable" on his pain medication regimen but also indicates that Parsley had been

"unable to pursue weaning" and Parsley was on "chronic <u>high potency</u> narcotics as a portion of his pain regiment." Tr. 997 (emphasis supplied). Without more thorough analysis by the ALJ, the Court is unable to conclude that the cited records provide substantial support for the ALJ's finding that Dr. Jones' opinion is inconsistent with his own treatment records.

Second, the ALJ stated that she was discounting Dr. Jones' opinion because "Dr. Jones was no longer providing medical treatment at the time the treatment was rendered." Tr. 28. While Dr. Jones may not have been treating Parsley at the time the opinion was rendered, the treatment relationship had only recently ceased. Dr. Jones rendered his opinion on June 10, 2015, less than one month after his May 27, 2015, letter wherein he indicated he was closing his outpatient practice. Considering the ALJ's own acknowledgment that Dr. Jones had an extensive relationship with Parsley (Tr. 28) and the relatively small gap of time between when the treatment relationship ceased and the rendering of the opinion, the Court finds that ALJ's second reason for discounting Dr. Jones' opinion is not a "good reason."

Third, the ALJ states:

> Furthermore, the opinion is inconsistent with the remaining evidence of record, which indicates chronic radiculopathic lumbar pain with decreased range of motion, sensation, and occasional weakness and gait abnormality, but also confirms normal reflexes, generally full upper extremity strength, and improvement with medication (Exhibit 1F, 2F, 3F, 7F, 9F, 11F).

Tr. 28. While observing multiple abnormal physical examination findings, the ALJ found Dr. Jones' opinion inconsistent with the remaining evidence of record. The ALJ makes note of some normal physical examination findings but does not adequately explain how Dr. Jones' opinion is inconsistent with the acknowledged abnormal findings. Without a more complete explanation, the Court is unable to conduct a meaningful review of whether the ALJ's reasons are "good reasons" supported by substantial evidence.

Based on the foregoing, the Court finds that remand is required for further analysis and explanation of the reasons for assigning only little weight to Dr. Jones' June 10, 2015, opinion.

*Dr. Fox*

The ALJ provided reasons for assigning little weight to Dr. Fox's June 14, 2016, opinion. However, without a more thorough analysis, the Court is unable to conduct a meaningful review to assess whether the ALJ's reasons are "good reasons" supported by substantial evidence.

First, the ALJ states that Dr. Fox's opinion is discounted because:

> [T]he opinion is inconsistent with Dr. Fox's own treatment notes, which contain examination findings of mild distress, moderately decreased lumbar range of motion with pain, tenderness to palpation of the lumbar paraspinals, minimal paraspinal spasm, decreased sensation at the right lumbar lower limb dermatomes, decreased right lower extremity strength, and allodynia over the right foot with discoloration, but normal upper extremity strength, sensation, and reflexes, normal, pain-free hip and knee range of motion, and normal reflexes (Exhibit 3F, 7F, 9F, 11F).

Tr. 29. As the ALJ did when discussing Dr. Jones' opinion, the ALJ observes multiple abnormal physical examination findings but nonetheless finds Dr. Fox's opinion inconsistent with treatment notes. The ALJ's notation of some normal physical examination findings does not adequately explain how or which portions of Dr. Fox's opinion are inconsistent with the acknowledged abnormal findings.

Second, citing to whole exhibits rather than specific treatment records, the ALJ states "Dr. Fox's notations of admitted improvement with medication and his prescribed conservative treatment also belie the opinion." Tr. 29. The Commissioner argues that this statement is supported by Dr. Fox's treatment notes located at Tr. 97 and Tr. 1003. Doc. 16, p. 14. Dr. Fox's treatment notes are not found at Tr. 97. That transcript page is part of state agency reviewing psychologist Dr. Voyten's Mental RFC Assessment. Tr. 97. The other page referenced by the Commissioner – Tr. 1003 – is from Dr. Fox's June 14, 2016, treatment notes. That record does

indicate that Parsley had been walking for exercise and his endurance and mobility were improved but it also notes that Parsley reported constant pain. Tr. 1003. Also, the extent of Parsley's walking was three times around the block for 45 minutes. Tr. 1003. Parsley was also walking in the water with resistance and swimming three times per week. Tr. 1003. Even if this is the record that the ALJ relied upon to support her second reason for discounting Dr. Fox's opinion, without further explanation the Court cannot assess whether it is supported by substantial evidence. For example, the ALJ should have more fully explained discounting Dr. Fox's opinion on the basis that Parsley received conservative treatment in view of the facts that Parsley was on high potency pain medications and had tried multiple other treatment options, including surgery, without success.

Third, the ALJ discounted Dr. Fox's opinion because she found that "[t]he opinion is also inconsistent with the remaining evidence of record, including the generally benign primary care examination findings (Exhibit 1F, 2F, 3F, 7F, 9F, 11F)." This vague and conclusory statement is similar to her first reason and again leaves this Court to speculate as to which portions of Dr. Fox's opinion were inconsistent with what "remaining evidence of record" and which "generally benign primary care examination findings" the ALJ was referring to. Without a more complete explanation, the Court is unable to conduct a meaningful review to assess whether the ALJ's reasons are "good reasons" supported by substantial evidence.

Based on the foregoing, the Court finds that remand is required for further analysis and explanation of the reasons for assigning only little weight to Dr. Fox's June 14, 2016, opinion.

*State agency reviewing psychologists*

In considering and assigning weight to the opinions of the state agency reviewing psychologists, the ALJ stated:

State disability determination services psychological consultants Karla Voyten, Ph.D., and Juliette Savitscus, Ph.D., opined that the claimant can understand and recall simple instructions involving 1-3 steps, can sustain an ordinary routine with occasional prompting, can interact briefly and occasionally in situations that do not require more than superficial contact, resolving conflicts, or persuading others to follow demands, and can work in an environment where duties are fairly static (Exhibit 2A, 4A). I give these opinions great weight, as they are consistent with the behavioral evidence of record, including the claimant's reported symptoms and examination findings of frequent mood abnormalities, tearfulness, and occasional agitation, irritability, and/or restlessness, but otherwise normal alertness, thoughts, speech, associations, and memory, a full range affect, appropriate language, adequate fund of knowledge, and fair insight and judgment (Exhibit 2F, 3F, 5F). In addition, as state agency consultants, Dr. Voyten and Dr. Savitscus are highly qualified by experience and training and are "experts in Social Security disability evaluation" (20 C.F.R. § 416.927(e)(2)(i); SSR 96-6p). Therefore, their opinions warrant great weight.

Tr. 29. The ALJ provided great weight to the opinions of the state agency reviewing psychologists but failed to incorporate certain portions of those opinions in the RFC. For example, the psychologists opined that Parsley could understand and recall simple instructions involving 1-3 instructions, could sustain an ordinary routine with occasional prompting, and could interact briefly and occasionally in situations that do not require more than superficial contact. Tr. 97, 110, 111. The ALJ, while recognizing the entirety of the opinions, omitted, without explanation, the underlined portions from the RFC. Tr. 16. This omission is material because, at the hearing, the VE indicated that there would be no work available when asked whether there would be work available to an individual as described in a hypothetical mirroring the ALJ's RFC assessment if the following additional limitations were included: "limited to one to three-step instructions, he would need occasional prompting to sustain a routine and he could only have brief, occasional, superficial contact with others[.]" Tr. 82. Considering this testimony, while Drs. Voyten and Savitscus are not treating physicians whose opinions are entitled to controlling weight and while an ALJ is not required to adopt a medical opinion

verbatim, in this instance reversal and remand is warranted for further explanation as to why the

ALJ excluded the underlined portions of the opinions from the RFC.

## VII. Conclusion

For the reasons set forth herein, the Court **REVERSES and REMANDS** the

Commissioner's decision for further proceedings consistent with this opinion.


Dated: January 28, 2019                    */s/ Kathleen B. Burke*
                                        Kathleen B. Burke
                                        United States Magistrate Judge